Catherine McANINCH, Plaintiff,

v.

**FEDERAL EXPRESS CORPORATION**
and Robert Cummings, Defendants.

No. 4:03–CV–90498.

United States District Court,
S.D. Iowa,
Central Division.

Nov. 8, 2005.

Jeffrey D Ewaldt, Whitfield & Eddy, P.L.C., West Des Moines, IA, Michael Edwin Gabel, Federal Express Legal Department, Richard Samuel McConnell, Jr, Federal Express Corp, Memphis, TN, Greg A Naylor, Whitfield & Eddy PLC, West Des Moines, for Robert Cummings, Federal Express Corp, Defendants.

Elizabeth Ann Flansburg, Lawyer Dougherty Palmer & Flansburg PLC, West Des Moines, IA, for Catherine McAninch, Plaintiff.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Before the Court are the following motions: Defendants' Motion for Summary

Judgment (Clerk's No. 17); Defendants' Motion to Strike Certain Exhibits and Portions of Plaintiff's Statement of Disputed Facts and Brief in Opposition to Defendants' Motion for Summary Judgment (Clerk's No. 37); and Plaintiff's Motion to Amend/Correct Complaint (Clerk's No. 44). Plaintiff's Complaint (Clerk's No. 1), filed September 8, 2003, alleges eight causes of action: 1) Invasion of Privacy–False Light; 2) Slander Per Se; 3) Sex Discrimination and Harassment in violation of Iowa Code Chapter 216; 4) Sex Discrimination and Sexual Harassment in violation of 42 U.S.C § 2000(e); 5) Retaliation in violation of Iowa Code Chapter 216; 6) Retaliation in violation of 42 U.S.C. § 2000(e); 7) Age Discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); and 8) Age Discrimination in violation of the Iowa Civil Rights Act ("ICRA"). Subject matter jurisdiction over the Title VII and ADEA claims is proper pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's Iowa claims is proper pursuant to 28 U.S.C. § 1367. Venue is proper in the Southern District of Iowa under 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in this district.

In the present motion for summary judgment, filed June 14, 2005, Defendants argue numerous legal reasons why they are entitled to judgment as a matter of law. Plaintiff filed a resistance to Defendants' Motion (Clerk's Nos. 25–27) and Defendants replied (Clerk's No. 36). In her resistance to Defendants' Motion for Summary Judgment, Plaintiff seeks to voluntarily dismiss the defamation, invasion of privacy, age discrimination, and retaliation claims in Counts I, II, V, VI, VII, and VIII. Accordingly, the only remaining claims left for consideration on summary judgment are those contained in Counts III and IV of Plaintiff's Complaint, that is, the Sexual Discrimination and Harassment claims under state and federal law.

Plaintiff has additionally filed a resistance to Defendants' Motion to Strike. Defendants have not formally resisted Plaintiff's Motion to Amend; however, the Court will treat Defendants' request in their Motion for Summary Judgment to dismiss Plaintiff's claim for naming the wrong party in interests as a resistance. The Court denies Defendants' Motion for Oral Argument as it does not appear that it would aid or assist the Court in the determination of the present motion. The matters are fully submitted.

## I. BACKGROUND

Plaintiff commenced employment at Federal Express Corporation, d/b/a/ FedEx Express ("FedEx Express"), in the Des Moines sales department in 1989. Plaintiff received several advances throughout her tenure with FedEx Express, eventually assuming the position of senior account executive. Plaintiff's manager at FedEx Express was located in Milwaukee, and Plaintiff only saw him approximately once every three months. As a FedEx Express employee, Plaintiff was required to make four face-to-face sales calls per day. There was no requirement that Plaintiff entertain clients in the form of lunch meetings or other activities away from the customer's business.

In approximately June 2000, a new company, known as FedEx Services, was formed. Fed Ex Services hired sales personnel who had previously worked for two other companies: FedEx Express and RPS (now known as FedEx Ground). While the FedEx Express management philosophy was described by at least one former employee as "loose," the sales personnel at RPS were admittedly subject to a more focused management structure.

RPS sales employees were held accountable for meeting strict objective performance criteria, including making eight face-to-face sales calls per day, and taking clients out for entertainment at least three times per week. RPS sales employees reported to a manager located locally in Des Moines. On June 1, 2000, Plaintiff became an employee of the newly formed FedEx Services, under the management of Defendant Robert Cummings, a former district sales manager for RPS. Cummings, in turn, reported to a female named Barbara Maloney. Cummings' sales team, as of June 2000, consisted of three former employees of FedEx Express, specifically Plaintiff, Greg Roberts, and Doug Roe, as well as several former RPS employees, including Jan Risen, Ken Frauenholz, Chris Burger, and Mike Vaske. All of the events forming the basis of Plaintiff's Complaint occurred while she was employed at FedEx Services.

As an employee of FedEx Services, Plaintiff was subject to objective performance evaluations, such as those previously employed by RPS. Sales employees of FedEx Services were required to conduct eight face-to-face customer sales calls per day and were required to conduct at least three "client entertainment" activities per week. Plaintiff's first complaint about Cummings arose during the context of a pre-merger meeting in approximately March 2000. During that meeting, an employee of either RPS or FedEx Express raised certain questions about how things had been done in the past. Cummings purportedly replied, "You're in Bob's world now." Pl.'s App. at 374 (Dep. of Douglas Roe). After meeting Plaintiff for the first time, Cummings told Todd Simpson, an operations manager with Federal Express Corp., that Plaintiff was a "short termer." Pl.'s App. at 312 (Aff. of Todd Simpson). Simpson interpreted this statement to mean that Cummings was out to get Plaintiff and warned Plaintiff of his belief. *Id.* Simpson also stated that it was clear to him that Cummings did not like the Plaintiff and wanted to either fire her or force her to quit. *Id.*

Numerous employees at FedEx Services appear to have harbored some negative feelings about Cummings during Plaintiff's employment. Tracy Willis, a ground operations manager,[1] noted that Cummings came into her office one day and questioned why she was seeing customers. Pl.'s App. at 323A. Willis felt that Cummings was rude and was "attacking [her] integrity."[2] *Id.* at 324. Likewise, upon first meeting Cummings, Julie Roe, a corporate account executive who sometimes went on sales calls with the Plaintiff, was told by Cummings that, "[I]f you were one of my employees, you would be-[the phrase was not completed in the testimony, but Roe believed Cummings was going to say 'in trouble'] because [she] didn't have a pen or pencil." Pl.'s App. at 336. Roe believed that Cummings was indicating that she would have been in big trouble were she Cummings' employee and was intimidated by the remark. *Id.* at 336, 338. Roe also recalled Cummings being very "short" with Plaintiff and believed that Cummings had a "good old boys network," and noted that "most all" of the women at the front office complained about Cummings at some point, but no male employees ever did. *Id.* at 339–40, 361. Judy

---

1. Willis noted that she "rarely" had contact with Cummings. Pl.'s App. at 323A.

2. While Willis does state that Plaintiff complained to her on occasion, she also noted that on occasions when she witnessed Cummings interact with Plaintiff, she "never saw him treat her the way he treated me" and that he was courteous and "somewhat professional" in those interactions. Pl.'s App. at 325.

Ostler, a customer service representative, noted that Plaintiff frequently complained about Cummings' treatment of females, and personally perceived Cummings as intimidating and rude. *Id.* at 391–95.

Certain male employees also noticed Cummings' behavior toward women, and toward Plaintiff in particular. Al Bell, a senior manager of operations, states that four female employees, Plaintiff, Tracy Willis, Denise Lundquist, and Judy Ostler, complained about the way Cummings treated them, having told him Cummings was "arrogant, rude and condescending toward them and that he had acted unprofessionally." Pl.'s App. at 314 (Aff. of Al Bell). Both Ostler and Willis were upset that Cummings had "jumped" them when he found they were making joint sales calls with Plaintiff, a practice that had been done for years and was approved by the corporate office. *Id.* Moreover, Bell noted that he "personally witnessed Mr. Cummings treat [Plaintiff] in a condescending manner and witnessed that he did not treat her with the same respect as he did other sales employees." *Id.* Rick Hardinger, a client of Plaintiff's, had lunch on numerous occasions with Plaintiff and Cummings. Pl.'s App. at 315 (Aff. of Rick Hardinger). He found Cummings was "condescending and sarcastic" towards Plaintiff and noted that when Plaintiff became defensive, Cummings would say things like "look what I have to put up with." *Id.*

On August 4, 2000, approximately three months after Cummings and Plaintiff began working together, Plaintiff sent Cummings an e-mail which stated in part:

> [W]e received goals last week, I am deeply disappointed by my goal attainment as I can see by your comments you are also. I am working hard, doing the right thing, trying to work thru a new manager, new style of management, new territory, new products, new work group, new automation system, new pricing system, new employee base (contractors, ground operators) ... staying positive and not feeling overwhelmed has been difficult for us all ... I have 16 years with this company and been thru lots of changes and I will survive this one ...it may be my imagine but on days like today (I am on vacation) and I get your comments I feel a great deal of hostility toward me... maybe it is your way of motivating but it feels awful from the chair I am sitting in ..... once again I will commit to you that I am doing everything I can to put my best performance on the table ...and at some given time I hope you are able to recognize some of the good things we are doing ....

Pl.'s App. at 166. On August 7, 2000, Plaintiff had a telephone conversation with Cummings and told him: "This is a very hostile work environment. I am miserable." Pl's App. at 430. Cummings left Plaintiff a voice mail message later asking to see her in his office. *Id.*

When Plaintiff arrived for the meeting with Cummings on August 8, 2000, Chuck Williams, another FedEx manager was present with Cummings in his office. During that meeting, Plaintiff told Cummings that she "thought he picked at me and on me," that she didn't trust him, that she thought he had shared personal information about her with other members of the sales team, that she "thought he had a tendency to try and humiliate [me,] to be funny at my expense," that she "was afraid to approach him about anything," and that his hostility was making her life "hell." Pl.'s App. at 431 (Dep. of Pl.). During the meeting, Cummings asked Plaintiff what she meant by "hostile environment." *Id.* at 433. Plaintiff responded that "he was creating a belittling, demeaning environ-

ment for me to be able to be successful at my job and that every time I tried to take a step forward, I felt like he had a wall there to block me, that I felt that ... he was trying to get rid of me, and he didn't find a fit for me in his-in his realm." *Id.* After the meeting, Plaintiff sent Cummings an e-mail thanking him for meeting with her and for addressing her professional concerns. Also after this meeting, Plaintiff complained to various FedEx management personnel about Cummings, but "admits that she did not make any other complaints to FedEx Services." Pl.'s Reply to Def.'s Revised Statement of Undisputed Facts ¶ 21.

On February 15, 2001, Cummings instructed Plaintiff to undergo a personality/skills evaluation, known as a Caliper Examination.[3] According to Plaintiff, the results of the exam were extremely favorable toward her, but nonetheless, Cummings continued to belittle and undermine her work. Indeed, Plaintiff claims that in Cummings' March 14, 2001 evaluation, Cummings was commended for leadership skills for "hold[ing] people accountable-e.g., G. Roberts and C. Macannich [sic]." Pl.'s App. at 170.

Plaintiff also asserts that Cummings intentionally altered her sales territory on numerous occasions. After the creation of FedEx Services, the four sales employees who lived in Des Moines met and mutually agreed on a division of geographic territories. Generally, each person took a portion of the metro Des Moines area that included that person's home, and then each person's territory extended out into the more rural parts of the state of Iowa, so that the central and western portions of the state were covered. While Plaintiff

lived in Urbandale, her territory at one point extended north to include Ames. Her sales territory was reduced when the Ames territory was reassigned to Alex Hoover, another sales representative. At the time, Plaintiff did not complain to Cummings, however, she did complain later when she was assigned to cover territory in Omaha, Nebraska. According to Plaintiff, Cummings personally altered her territory four times, while leaving the territory of other sales executives largely intact. Plaintiff asserts that she was the least equipped to handle the Omaha territory, even though her territory was adjacent to the open Omaha territory. Plaintiff complained to Cummings that she was concerned about the effect of the added mileage on her car lease, but never provided information that Cummings requested from her to determine if a rental car would be appropriate. Plaintiff covered the Omaha territory for nine months.

In February 2002, Cummings issued a memo to Plaintiff noting that she had failed to meet her sales and entertainment goals for the previous quarter. He also issued a "letter of documented counseling for unsatisfactory performance" and put Plaintiff an a "performance plan" that required Plaintiff to improve her goal attainment numbers. In May 2002, Cummings issued an annual performance review, rating Plaintiff's performance as 1.9 on a 4 point scale (anything under 2.0 is less than satisfactory). Plaintiff admits that she did not attain all of her sales and entertainment goals prior to the evaluation, but maintains that Cummings did not score her performance low on that basis. Over the next few months, Plaintiff's goal attain-

---

**3.** Cummings declares that every member of his team was required to undergo the evaluation. Def.'s Supp.App. at 137–38. Specifically, it is noted that former RPS members took the exam when they applied for positions with RPS, and that Greg Roberts, the only other former FedEx Express team member at the time was also required to take the exam.

ment levels improved and she was taken off the "performance plan" in June 2002.

At approximately the same time that Plaintiff was taken off the "performance plan," Cummings states that he began to question the legitimacy of Plaintiff's sales records. Apparently one item that sparked Cummings' suspicions was that Plaintiff, in May 2002, made an inadvertent phone call to Cummings. Plaintiff admits that her cell phone may have accidentally dialed Cummings' number and that Cummings overheard her having a conversation with her brother during working hours. To Cummings, this meant that Plaintiff could not have been making sales calls during the time of her conversation. Cummings reviewed Plaintiff's report of call activity from that day and it indicated that Plaintiff had met with a manager at FedEx Express to discuss business. Cummings had not seen Plaintiff in the office that day. Cummings testified at deposition that when he asked the FedEx Express manager if he had met with Plaintiff that day, he was told that no such meeting had occurred.[4] Additionally, Cummings testified that he made phone calls to Plaintiff during the middle of the day when she should have been on sales calls, and heard a dog barking in the background. On June 24, 2002, Cummings again reviewed Plaintiff's report of daily activities and saw that she had met with another manager at FedEx Express to discuss business. According to Cummings, when he asked the manager about the meeting, he was told that the manager had met with Plaintiff, but had not discussed any business.[5]

Based on these events, Cummings testified that he developed a belief that Plaintiff was not accurately reporting her sales call activities in her daily reports. He decided to observe Plaintiff's activities to verify the veracity of her reports. Cummings testified that he had previously observed two male employees in a similar manner when he had become suspicious about the truthfulness of their reports.[6] On June 25, 2002, Cummings parked his car on the street where Plaintiff lived in order to follow her and observe her sales call activities. According to Cummings, he sat outside Plaintiff's house for half of the day, but never saw Plaintiff leave. Rather, Cummings claims he saw Plaintiff on several occasions throughout the day wearing casual attire while she watered flowers and took out the trash. Cummings testified that he spoke with his supervisor, Barbara Maloney, via cell phone to discuss his observations. When Plaintiff turned in her sales call activity for the day of June 25, 2002, she reported she had made twelve face-to-face sales calls and included descriptions of what activities occurred during those calls. Plaintiff also submitted a request for mileage reimbursement for traveling 61 miles to the twelve calls.

Cummings testified that he arranged to meet with Plaintiff on July 2, 2002 to discuss his belief that her sales call report could not have been accurate in light of his observations. Cummings also input the sales locations into MapQuest in an effort to determine if Plaintiff's mileage claims were accurate. As well, Cummings claims to have contacted customers on the report to determine the veracity of Plaintiff's re-

---

**4.** Plaintiff denies that Cummings was told no meeting had occurred and further denies that she did not meet with Chuck Williams that day.

**5.** Plaintiff insists that she met with Al Bell on the day in question and discussed business.

**6.** According to Cummings, one employee's observed activity matched his reporting and the other male employee who was observed resigned before he could be terminated.

port. When Cummings met with Plaintiff on July 2, 2002, he asked Plaintiff to write down her activities, but Plaintiff refused because she did not have her notes or her Day Planner with her and did not feel she could accurately report the information without those items. Cummings terminated Plaintiff's employment for falsification of records.

The following day, July 3, 2002, Plaintiff met with Cummings to begin an internal appeal of her termination, in accordance with the internal appeals process at FedEx Services. Cummings refused to reconsider his position. Plaintiff, therefore, pursued the next step of her internal appeal, and requested a review of her termination by Cummings' supervisor, Barbara Maloney. Maloney held a conference call with Plaintiff and Joan Helms, a human resources representative for FedEx Services. While Plaintiff's sales report reflected customer calls each half hour from 9:00 a.m. to 3:30 p.m., Plaintiff maintained that she did make the calls in question, but actually made her sales calls between 11:30 a.m. and 4 p.m. She only entered the calls into the tracking system from 9:00 a.m. because the computer system only permits sales calls to be entered in 30 minute intervals. Plaintiff presented Maloney with e-mails from several of the customers who indicated that they saw her on June 25, or sometime in the latter part of June. Maloney also reviewed additional information that had been gathered after Plaintiff's termination. For example, an evaluation of Plaintiff's laptop computer purportedly revealed that she had accessed various non-work related websites during the afternoon hours of June 25. Additionally, one of the customers listed on Plaintiff's sales report allegedly told FedEx Services that Plaintiff had contacted him and asked him to tell anyone who called that he had seen her on June 25. *See* Def.'s App. at 425 (Aff. of Todd Palm-

er). Ultimately, Maloney upheld Plaintiff's termination. Plaintiff next pursued the final step in her internal appeal, a review by Maloney's supervisor, Dave Russell. Russell also upheld the decision to terminate Plaintiff's employment.

Plaintiff maintains that Cummings created a hostile work environment and discriminated against her on the basis of her gender. She asserts that Cummings' reports of his observations on June 25, 2002, and his reports of purported discrepancies in Plaintiff's account of events are fabricated, unfounded, and are merely a cover-up for his gender bias.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not "'to cut litigants off from their right of trial by jury if they really have issues to try,'" *Poller v. Columbia Broad. Sys.*,

*Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Board of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. LAW AND ANALYSIS

### A. *Should Plaintiff's Claims be Dismissed for Failing to Name the Proper Defendant?*

Defendants first argue that the Court should dismiss Plaintiff's Complaint as a matter of law because Plaintiff was not an employee of Federal Express Corporation ("FEC") at the time of her termination or at the time of the other events forming the basis of her Complaint. Plaintiff concedes that effective June 1, 2000, FedEx Corporate Services, Inc. ("FedEx Services") became her employer and remained her em-

ployer until her termination. Both FEC and FedEx Services are wholly owned subsidiaries of a publicly traded holding company known as FedEx Corporation ("FedEx"). According to the Affidavit of Edward C. Klank III, Senior Counsel for FedEx, FEC has no control over FedEx Services' operations or employment decisions. *See* Def.'s App. at 353–55 (Klank Aff.). Thus, according to Defendants, FEC cannot legally be held liable for the conduct of FedEx Services. *See e.g., Morgan v. Safeway Stores, Inc.,* 884 F.2d 1211, 1213–14 (9th Cir.1989) (two corporate entities will only be treated as one if they have interrelated operations, common management, centralized control of labor relations, and common ownership or financial control).

Federal Rule of Civil Procedure 15(a) provides:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Fed.R.Civ.P. 15(a). Rule 15(c) provides for relation back of amendments in certain circumstances:

> An amendment of a pleading relates back to the date of the original pleading when
>
> (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
>
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth

or attempted to be set forth in the original pleading, or

> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c). Plaintiff urges the Court to permit amendment of her Complaint to name FedEx Services as the proper party in interest under Rule 15(c). Specifically, Plaintiff argues that the allegations in the Complaint and the proposed amendment are identical and that FedEx Services knew that, but for a legal mistake, it would have been named as a Defendant in the original Complaint. Moreover, Plaintiff points out that FedEx Services, through its attorneys, has participated in this lawsuit since its inception and thus, would not be prejudiced in any way by permitting the amendment.

On the present facts, the Court finds that dismissal of the action would constitute an unjust and overly harsh remedy. Indeed, Plaintiff has adequately shown her entitlement to relief under Rule 15(c)(3). In response to Defendants' assertion in their summary judgment motion that Plaintiff has named the wrong party in interest, Plaintiff requested that amendment be permitted, both in her responsive pleading and in a separate Motion to Amend. Plaintiff's asserted causes of action are precisely the same in the original complaint and in the proposed amended

complaint. In answer to the original Complaint naming FedEx as a Defendant, FedEx never indicated that it was not a proper party to the claim until moving to dismiss the matter in its motion for summary judgment. While Plaintiff offers only a mistaken belief that the misnomer was inconsequential as a basis for not moving to amend the Complaint sooner, the Court finds it clear, particularly from the active involvement of FedEx counsel since the inception of the case, that the proper Defendant was well aware that, but for a mistake concerning the identity of the real party in interest, that FedEx Services should and would have been named as Defendant in this action. *See e.g., Roberts v. Michaels*, 219 F.3d 775, 778 (8th Cir. 2000) (permitting relation-back amendment when provisions of Rule 15(c)(3) were satisfied). Accordingly, the Court permits Plaintiff's proposed amendment of her Complaint for the sole purpose of replacing the presently named Defendant with FedEx Services as the proper named Defendant.

### B. *Defendants' Motion to Strike*

■ Defendants seek to strike numerous documents filed in support of Plaintiff's Resistance to Defendants' Motion for Summary Judgment as unauthenticated, unsworn, uncertified, and inadmissible hearsay statements. Specifically, Defendants seek to strike Tabs 1–20, Tabs 23–46, Tab 50, and portions of Tabs 47, 48, and 51 of Plaintiff's Appendix. Defendants request that any portions of Plaintiff's pleadings relying upon these documents be stricken as well.

With regard to Tabs 1–20, Plaintiff contends that each of these documents were produced by Defendants in connection with Plaintiff's discovery requests. The documents include such items as Plaintiff's annual reviews, letters of commendation regarding Plaintiff and contained in her personnel file, annual reviews of co-workers, e-mails from Plaintiff to Cummings stored in her personnel file, performance reviews, and miscellaneous other records contained in Plaintiff's personnel file. To the extent that any of the documents were authored by Plaintiff, such as e-mails from Plaintiff to Cummings included in Tabs 4, 8–9, 12, and 14, Plaintiff has provided an affidavit attesting to the authenticity of the documents. Defendant has not offered any evidence indicating that the documents in Tabs 1–20 were not kept in the normal course of business or that these same documents were not produced by Defendants in response to a valid discovery request by Plaintiff. Accordingly, the Court declines to strike the documents as they are admissible under Federal Rule of Evidence 803(6), as records of regularly conducted business activity.

With regard to Tab 17, which includes numerous e-mails from customers attesting to certain activities of the Plaintiff, Plaintiff originally supplemented six of nine of the e-mails with affidavits attesting to their authenticity as e-mails written from customers to the Plaintiff. Plaintiff has also supplemented her Appendix to provide additional affidavits attesting to the authenticity of two additional e-mails. The only unauthenticated document in Tab 17, then, is an e-mail purportedly written by customer Greg Cannon of Jacobson Transportation Co., Inc. The Court will disregard this document as hearsay to the extent it is relied on to prove the truth of the matter asserted.

With regard to Tabs 23–46, Plaintiff again asserts that the documents contained in Tabs 23 and 26–46 were produced by Defendants during the course of discovery. Defendants have not offered any evidence to the contrary and the Court, therefore, declines to strike the documents from the record. Tab 24 re-

flects a letter from Plaintiff's physician that is not relied upon by either of the parties regarding the present Motion for Summary Judgment and therefore, will not be stricken. Tab 25 represents a computer printout introduced by Defendants as a document during Plaintiff's deposition. It is not relied on in consideration of the present Motion for Summary Judgment and will not be stricken.

Defendants next object to Tab 47, paragraphs 5–8 and 9. Tab 47 is an affidavit of Todd Simpson. Paragraphs 5–8 detail Simpson's observations at a meeting he attended where it was decided that Plaintiff would be assigned to cover the Omaha territory. Simpson clearly has firsthand knowledge of the meeting and any statements articulated are admissible as those of a party-opponent. Paragraph 9 notes that Plaintiff complained to Simpson about the way that Cummings treated her on numerous occasions. The statement is not offered for the truth of the matter asserted and is therefore not inadmissible hearsay.

With regard to Tab 48, the Affidavit of Al Bell, Defendants object to paragraphs 2–6, which detail Bell's observations that female employees of the company complained about Cummings treatment of them. Plaintiff asserts that this affidavit is offered only to impeach Cummings' statements in deposition that he was never rude or arrogant to the listed women. The document will not be stricken.

Finally, Plaintiff offers Tab 50, the affidavit of Carmen Stone, detailing discussions with Cummings' wife wherein the two purportedly discussed Cummings' stated dislike of Plaintiff. Plaintiff admits that the document is hearsay, but contends it is only offered to impeach Cummings' testimony that he never complained to his wife about the Plaintiff. The Court agrees the document constitutes inadmissible hearsay, however, because the Court does not rely on this document in its evaluation of the Defendants' Motion for Summary Judgment, there is no need to strike it from the record at this time.

### C. Sexual Discrimination and Harassment

Plaintiff charges that FedEx Services and Cummings sexually harassed and discriminated against her and maintained a hostile work environment, eventually terminating her employment in violation of Title VII and the Iowa Civil Rights Act ("ICRA"). Defendants deny Plaintiff's claims and assert that summary judgment is appropriate on the present record because: 1) Plaintiff cannot show that similarly situated male employees were treated differently than she was; 2) Plaintiff cannot show that FedEx Services' legitimate nondiscriminatory reason for her discharge was mere pretext for gender discrimination; 3) Plaintiff cannot show that she was subjected to a hostile work environment on the basis of her gender, or that the hostile environment was sufficiently severe and pervasive to maintain a claim.

### 1. Hostile work environment.

Hostile work environment harassment occurs when "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations omitted). In order to succeed on a hostile work environment claim under Title VII, Plaintiff must establish: 1) she is a member of a protected class; 2) unwelcome harassment occurred; 3) there is a causal nexus between the harassment and her protected-group status; 4) the harassment affected a term,

condition, or privilege of her employment; and 5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *See Robinson v. Valmont Ind.*, 238 F.3d 1045, 1047 (8th Cir.2001); *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir.1996). "The standards for judging hostility must be sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Stuart v. General Motors Corp.*, 217 F.3d 621, 632 (8th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

In moving for summary judgment, a defendant must demonstrate that at least one element fails and that there is no genuine issue of material fact regarding this failure. *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1205 (8th Cir.1997) ("[S]ummary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case."). Here, Defendants assert that Plaintiff has failed to show a causal nexus between the allegedly harassing conduct and Plaintiff's status as a female, and that Plaintiff has not shown that the conduct complained of was sufficiently severe or pervasive to establish a hostile work environment and thus affect a term, condition, or privilege of her employment. Moreover, Defendants argue that Plaintiff failed to avail herself of the complaint mechanisms provided by her employer, thus entitling Defendants to judgment as a matter of law.

■ While Plaintiff's Complaint appears to state a claim for hostile work environment, Plaintiff's Resistance to Defendant's Motion for Summary Judgment makes virtually no reference to the standards necessary to establish a hostile work environment claim. Rather, the Resistance seems to focus almost exclusively on Plaintiff's assertion of gender discrimination in violation of Title VII and the ICRA. While a hostile work environment claim is a form of gender discrimination, Plaintiff appears to abandon any hostile work environment claim in her resisting submissions. The failure of Plaintiff to adequately respond to the Motion for Summary Judgment in this regard constitutes an independent basis upon which the Court may, and does, grant summary judgment on the hostile work environment claim. Nonetheless, the Court will also consider the merits of the alleged claim in accordance with the standards articulated in *Robinson*.

### a. *Causal nexus*

■ Employees are entitled to a workplace free from "discriminatory intimidation, ridicule, and insult" motivated by the employee's membership in a protected class. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367; *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir.1997). All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus. *See Hall v. Gus Const. Co., Inc.*, 842 F.2d 1010, 1014 (8th Cir.1988); *see also Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148–49 (3d Cir.1999); *Doe*, 119 F.3d at 577–78; *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir.1987); *McKinney v. Dole*, 765 F.2d 1129, 1138–39 (D.C.Cir.1985). Nonetheless, "Title VII does not ... create a cause of action for all unpleasant or abusive behavior in the workplace." *See Hathaway*, 132 F.3d at 1221. Rather, Plaintiff must show that the offensive conduct was "discriminatory in nature and that she was singled out for such treatment on the basis of her [gender]." *Id.*

■ In the present case, Plaintiff claims that Cummings was rude, intimidating, and brusque with her from the time of their initial meeting, and treated other women at FedEx similarly. Plaintiff claims that Cummings made comments such as, "You're in Bob's World now," "look what I have to put up with," and "no wonder my wife takes sharp objects out of my hands" in her presence. Plaintiff states that Cummings referred to her as a "short-termer," prior to even meeting her and despite her accomplishments with FedEx over the past many years, and was "gunning for her" in an effort to dismiss her from her employment. She states that Cummings harassed female employees about making joint sales calls, but never did so with male employees. Plaintiff claims that she was forced to undergo a Caliper evaluation to determine if she "fit in with the team," but no other employees were required to undergo the evaluation. Plaintiff further asserts that Cummings changed and disrupted her sales territory on at least four occasions, and unreasonably required her to cover territory in Omaha, though she claims to have been the least equipped employee to cover that territory. Plaintiff claims that Cummings set her sales goals unrealistically high and disciplined her when she failed to meet them, and disciplined her for faulty computer entries, but did not discipline anyone else for the same problems. Plaintiff urges that Cummings routinely excluded her and other female employees from meetings and gatherings, and relegated "women's work" to her at meetings she did attend, such as ordering lunch and cleaning up afterwards. Plaintiff claims that Cummings criticized her apparel and accessories and eventually became so suspicious of her that he surveilled her daily activities and fabricated a story designed to result in her termination.

■ While it is clear that Plaintiff endured unfavorable treatment at the hands of Cummings, the question at this stage of analysis remains whether there exists a causal nexus between the treatment and Plaintiff's protected status as a female. First, with regard to Cummings comments, such as "You're in Bob's World now," and "no wonder my wife takes sharp objects out of my hands," despite Plaintiff's assertions that the comments are inherently gender-biased, she has failed to point to evidence that would permit a jury the Court to make that conclusion as a matter of law. "A plaintiff's subjective belief or speculation that neutral statements are discriminatory does not establish a claim of hostile work environment." See Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000); Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir.2000). Plaintiff has not provided any basis from which the Court could conclude that Cummings' comments, standing alone, were directed at her due to her membership in a protected class.

In regard to Cummings' alleged harassment of female employees for making joint sales calls, the Court believes that Plaintiff has shown evidence that Cummings treated males and females differently in this respect. Deposition testimony of numerous FedEx employees, taken in the light most favorable to Plaintiff's claims with respect to disparate treatment, indicates that Cummings berated female employees for making joint sales calls, particularly with the Plaintiff, but did not do the same with male employees. While Defendants urge that the differences are due to the varied positions held by each of the females and corresponding determinations about the appropriate role of each position, the Court believes the issue is a factual one, appropriate for a jury's consideration. Likewise, with regard to territorial changes, there is testimony in the record

indicating that many other employees underwent changes, including male employees, both for the better and for the worse. *See e.g.,* Def.'s App at 276 (Dep. of Greg Roberts) (stating that between June 2000 and July 2002, his territory "changed several times"); Def.'s App. at 298–300 (Dep. of Jan Risen) (indicating that her territory also changed several times under the management of Cummings). Nonetheless, the record reveals that Plaintiff was the most often and most severely affected, while male members of her team were not so adversely affected.

b. *Severe and pervasive*

 Assuming, then, that Plaintiff has adequately raised an inference that Cummings treated her differently because she is female, Plaintiff has failed to present evidence sufficient to establish another essential element of her claim, that is that the hostile work environment was sufficiently severe or pervasive. To prevail on a hostile work environment claim, a plaintiff must show both that the offensive conduct created an objectively hostile work environment and that she subjectively perceived the working environment as abusive. *See Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (the objectionable environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so") (citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367); *see also Hathaway,* 132 F.3d at 1221 (citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). To satisfy the requirement that the work environment be objectively hostile or abusive, a plaintiff must show that the complained of conduct was "severe or pervasive." *Klein v. McGowan,* 198 F.3d 705, 709 (8th Cir.1999) (citing *Harris,* 510 U.S. at 21, 114 S.Ct. 367); *Delph v. Dr. Pepper Bottling Co.,* 130 F.3d 349, 354 (8th Cir. 1997). "A court evaluating a Title VII claim must evaluate the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Klein,* 198 F.3d at 709. "Simple teasing, offhand comments, and isolated incidents generally cannot amount to severe or pervasive harassment." *Id.* Rather, the "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher,* 524 U.S. at 789, 118 S.Ct. 2275 (citations omitted).

 Plaintiff has certainly produced evidence that she has experienced subjectively offensive behavior. At deposition, Plaintiff expressed feelings that she was singled out by Cummings for differential treatment and that, from day one of their working relationship, she felt that Cummings did not like her. Whether or not the Plaintiff felt harassed, however, is not determinative. Plaintiff's perception that she was subjected to a hostile work environment on the basis of her gender must not only be subjectively reasonable, but objectively reasonable as well. Even considering the totality of all the alleged harassment at the hands of Cummings, the Court cannot say that this amount of harassment gives rise to an inference that gender-motivated offensive behavior at FedEx Services was so severe as to "poison" Plaintiff's work environment. *See LeGrand v. Area Res. for Cmty. and Human Servs.,* 394 F.3d 1098, 1102 (8th Cir.2005).

In sum, Plaintiff has failed to satisfy the "high threshold of actionable harm," by demonstrating that her workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Elmahdi v. Marriott Hotel Servs., Inc.,* 339 F.3d 645, 653 (8th Cir.2003) (citation and internal

quotations omitted). Specifically, the Court notes that there is no indication that the allegedly harassing behavior unreasonably and objectively interfered with the terms or conditions of Plaintiff's employment. Indeed, the severity and pervasiveness of Plaintiff's claim is far less than that of many cases where a claim of hostile work environment was rejected as a matter of law. *See Scusa,* 181 F.3d at 967 (experiencing unpleasant conduct and rude comments does not equate to severe or pervasive harassment that altered conditions of employment). Numerous cases have rejected hostile work environment claims premised upon facts equally or more egregious than the conduct at issue here. *See, e.g., Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 872, 874 (5th Cir.1999) (holding that several incidents over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, repeated touching of plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile work environment claim); *Adusumilli v. City of Chicago,* 164 F.3d 353, 357, 361–62 (7th Cir.1998) (holding conduct insufficient to support hostile environment claim when employee teased plaintiff, made sexual jokes aimed at her, told her not to wave at police officers "because people would think she was a prostitute," commented about low-necked tops, leered at her breasts, and touched her arm, fingers, or buttocks on four occasions); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 823–24, 826 (6th Cir.1997) (reversing jury verdict and holding behavior merely offensive and insufficient to support hostile environment claim when employee reached across plaintiff, stating "[n]othing I like more in the morning than sticky buns" while staring at her suggestively; suggested to plaintiff that parcel of land be named "Hootersville," "Titsville,"

or "Twin Peaks"; and asked "weren't you there Saturday night dancing on the tables?" while discussing property near a biker bar); *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993) (holding no sexual harassment when plaintiff's supervisor asked plaintiff for dates, asked about her personal life, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs at her work station, and attempted to kiss her twice at work and once in a bar). In short, the frequency, severity, and pervasiveness of Plaintiff's alleged harassment are simply insufficient to establish an actionable claim for hostile work environment. *See Duncan v. General Motors Corp.,* 300 F.3d 928, (8th Cir.2002) (finding that harassment of both genders created a jury question on the causal nexus question, but affirming judgment as a matter of law for defendant as to severity and pervasiveness where evidence revealed ten incidents where a training coordinator directed behavior at plaintiff alone, including propositioning her for a relationship, touching plaintiff's hand, asking her to make a sketch with sexual implications, and putting up a poster portraying plaintiff as president of the "Man Hater's Club").

### c. *Failure to avail reasonable corrective opportunities*

While the Court has determined that Plaintiff's hostile work environment claim is insufficient to survive summary judgment, both on the inadequacy of Plaintiff's resistance to the motion and on the merits of the case, Defendants vehemently assert that they are entitled to judgment as a matter of law on the basis of their affirmative defense that Plaintiff failed to avail herself of reasonable corrective opportunities, as that defense was established in *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633

(1998) and *Faragher,* 524 U.S. at 776–78, 118 S.Ct. 2275. While it is not necessary to evaluate Defendants' position in light of the determinations already made, the Court will nonetheless address the merits of Defendants' assertion.

 In *Faragher* and *Ellerth,* the United States Supreme Court announced the appropriate standards to be applied in determining whether an employer may be held liable for a supervisor's sexually harassing conduct. The Court articulated two methods for analyzing sexual harassment claims where, as here, the alleged discriminatory conduct was committed by the plaintiff's supervisor:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule. Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth,* 524 U.S. at 766, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 778, 118 S.Ct. 2275. Accordingly, the affirmative defense of reasonable care by the employer and unreasonable failure to take advantage of corrective opportunities may lie where no tangible employment action is taken. When, however, an employment action occurs with tangible results, an employer is liable once the discrimination is shown.

*Faragher,* 524 U.S. at 786, 118 S.Ct. 2275 (citing *Meritor Sav. Bank,* 477 U.S. at 70–71, 106 S.Ct. 2399). Such liability attaches "whether or not the employer knew, should have known, or approved of the supervisor's actions." *Meritor Sav. Bank,* 477 U.S. at 75, 106 S.Ct. 2399. The Supreme Court further explained that "tangible employment action" includes a "discharge, demotion, or undesirable reassignment." *Faragher,* 524 U.S. at 778, 118 S.Ct. 2275. (citing *Ellerth,* 524 U.S. at 768, 118 S.Ct. 2257). Here, the affirmative defense is inapplicable because Plaintiff alleges and has shown a tangible employment action, both in her assignment to the Omaha territory, and in her eventual termination.

### 2. *Gender discrimination.*

 Federal case law supplies the basic framework for deciding cases under the ICRA. *Quick,* 90 F.3d at 1380 (citing *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n,* 322 N.W.2d 293, 296 (1982)). Iowa courts "traditionally turn to federal law for guidance on evaluating the ICRA, but federal law ... is not controlling." *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (citations omitted). Neither party posits any separate legal arguments regarding Plaintiff's ICRA claims. The Court, therefore, will address Plaintiff's federal and state law claims of sex discrimination, harassment, and hostile work environment together.

The analytical framework for discrimination, harassment, and hostile work environment claims under Title VII, uses two separate methods to determine whether a plaintiff was subject to discrimination. The choice between the two analyses depends on whether a plaintiff presents direct evidence of the alleged discrimination, thereby warranting a "mixed motive" theory of analysis as explained in *Price Water-*

*house v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or indirect or circumstantial evidence of the alleged discrimination which requires a "burden-shifting" framework of analysis under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

If a plaintiff produces direct evidence of the alleged discrimination, the plaintiff must persuade the fact finder under the "mixed motive" theory of analysis. The plaintiff must persuade the fact finder that, more likely than not, discrimination was "a motivating part in an employment decision." *Price Waterhouse,* 490 U.S. at 254, 109 S.Ct. 1775. The burden then "shifts to the employer to prove that the employment decision would nevertheless have been made for legitimate, nondiscriminatory reasons." *Yates v. McDonnell Douglas,* 255 F.3d 546, 548 (8th Cir.2001). Direct evidence of discrimination has been defined by the Eighth Circuit as "evidence or conduct or statements by persons involved in the decision-making process that is sufficient for the fact finder to find that a discriminatory attitude was more likely than not a motivating factor in the employers' decision." *Kerns v. Capital Graphics, Inc.* 178 F.3d 1011, 1017 (8th Cir.1999). The Eighth Circuit goes on to state that "such evidence might include proof of an admission that gender was the reason for an action, discriminatory references to the particular employee in a work context, or stated hostility to women being in the workplace at all." *Id.; see also Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir. 1991) ("direct evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude ... [c]omments which demonstrate a 'discriminatory animus in the decisional process' ... or those uttered by individuals closely involved in employment decisions may constitute direct evidence." (citations omitted)).

Plaintiff here claims that Cummings made numerous sexist and degrading comments indicative of his prejudice toward females, and urges the Court to apply the *Price Waterhouse* standard. Specifically, Plaintiff points to the following facts supporting application of the direct evidence standard of review: 1) Cummings told Todd Simpson that Plaintiff was a "short termer" after first meeting Plaintiff; 2) Cummings divided Plaintiff's sales territory four times in two years, reassigned accounts, and forced her to work in Omaha; 3) Cummings held Plaintiff to a stringent dress code; 4) Cummings held Plaintiff to a different standard than her male colleagues; 5) Cummings relegated Plaintiff to perform "women's work" during quarterly meetings; 6) Cummings was rude and condescending to Plaintiff in front of her customers and made comments such as, "See what I have to put up with?" and "Do you see why my wife takes sharp objects out of my hand?" when Plaintiff attempted to stand up for herself. Plaintiff claims that these statements and actions of Cummings are inherently sexist. The Court disagrees.

Nothing on the face of Cummings' statements or actions clearly demonstrates a bias or discriminatory attitude toward women. Indeed, much more circumstantial evidence is necessary to even draw the inferences that Plaintiff seeks to have made. Accordingly, the Court will not apply the *Price Waterhouse* standard, but will instead rely on the traditional *McDonnell Douglas* analysis in evaluating Plaintiff's claim of gender discrimination.

Where a plaintiff relies on circumstantial, rather than direct, evidence of intentional discrimination, the court applies the three-stage burden shifting approach developed by the Supreme Court in *McDonnell Douglas,* and later refined in *Texas*

*Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Dammen v. UniMed Med. Ctr.,* 236 F.3d 978, 980 (8th Cir.2001). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff establishes a prima facie case, the burden of production shifts at the second stage to the defendant, who must articulate some legitimate, nondiscriminatory reason for the adverse employment action. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case." *Id.* at 255 n. 10, 101 S.Ct. 1089. The burden then shifts back at the third and final stage to the plaintiff, who is given the opportunity to show that the employer's proffered reason was merely a pretext for discrimination. *Id.* at 253, 101 S.Ct. 1089. The ultimate burden remains with the plaintiff at all times to persuade the trier of fact that the adverse employment action was motivated by intentional discrimination. *Id.*

To establish a prima facie case of gender discrimination, Plaintiff must show: (1) plaintiff is a member of a protected class; (2) plaintiff met applicable job qualifications; (3) despite her qualifications, plaintiff suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably. *See Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000); *Whitley v. Peer Review Sys., Inc.,* 221 F.3d 1053, 1055 (8th Cir.2000). On the present facts, there is no doubt that Plaintiff's status as a female makes her a member of a protected class. Moreover, Defendants do not appear to dispute that Plaintiff met the applicable qualifications for her position as a sales executive or that she suffered an adverse employment action. Defendants do, however, dispute whether Plaintiff was treated less favorably than were similarly situated male employees.

### a. *Similarly-situated*

Not only must Plaintiff identify males who were treated more favorably, but Plaintiff also bears the burden of proving by a preponderance of the evidence that the male employees who were treated more favorably than she were " 'similarly situated in all relevant respects.' " *Jones v. Frank,* 973 F.2d 673, 676 (8th Cir.1992) (quoting *Lanear v. Safeway Grocery,* 843 F.2d 298, 301 (8th Cir.1988)); *see also Lynn v. Deaconess Med. Ctr. W. Campus,* 160 F.3d 484, 487–88 (8th Cir.1998) (citing *Harvey v. Anheuser–Busch, Inc.,* 38 F.3d 968, 972 (8th Cir.1994)). As a general matter, the ultimate determination of whether "employees are 'similarly situated' to warrant a comparison to a plaintiff is a 'rigorous' one." *Palesch,* 233 F.3d at 568 (citing *Harvey,* 38 F.3d at 972). Indeed, the Eighth Circuit Court of Appeals has identified factors to be considered when evaluating whether employees are similarly situated to one another: "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark,* 218 F.3d at 918 (citing *Lynn v. Deaconess Med. Ctr.-W. Campus,* 160 F.3d at 487–88).

Historically, the Eighth Circuit has routinely applied the rigorous "similarly-situated" standard to its review of summary judgment motions in employment discrimination cases. In 2005, however, the Court noted that another line of cases has applied a "low threshold" for employees to be considered similarly-situated at the prima

facie stage of the *McDonnell Douglas* burden-shifting analysis. *See Rodgers v. U.S. Bank,* 417 F.3d 845, 852 (8th Cir.2005). This "low threshold" standard requires at the prima facie stage only that "employees 'are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Id.* at 851 (citing *Wheeler v. Aventis Pharms.,* 360 F.3d 853, 857 (8th Cir.2004)). Noting the conflicting lines of cases, the *Rodgers* Court chose "to follow the low-threshold standard for determining whether employees are similarly situated" at the prima facie stage of analysis. *Id.* at 852. Thus, to establish her prima facie case, Plaintiff must show that a male employee was involved in or accused of the same conduct and was disciplined in a different way. *Id.* Defendant points to two male employees suspected of falsifying sales call records. One such employee was surveilled by Cummings, but his sales records matched the observed activities, so no disciplinary action was taken. The other "resigned before he could be terminated," and thus, according to Defendants, was no longer similarly situated to Plaintiff.

The difficulty in this case is the presence of evidence indicating that Plaintiff did not, in fact, falsify her call records. Indeed, Plaintiff's claim hinges on the notion that Cummings fabricated the entire falsification of records claims merely to terminate her employment with FedEx Services. To require Plaintiff to demonstrate that a male counterpart received more favorable treatment than did Plaintiff after falsifying sales records ignores the factual dispute regarding whether or not Plaintiff was falsely accused of falsifying sales records in the first instance. If, as Defendants claim, Plaintiff did falsify her sales records, then Plaintiff would indeed need to point to a "similarly situated" male counterpart, that is, a male employee of FedEx Services that was found to have falsified sales records, but received some disciplinary action short of termination. If, on the other hand, the evidence of Plaintiff's falsification of sales records was fabricated by Cummings, as Plaintiff urges, similarly situated male counterparts would be male employees, such as those in Plaintiff's work group, that were not terminated on a false pretense.

Cummings states that, after becoming suspicious about the accuracy of Plaintiff's sales reports, he observed Plaintiff from approximately 7:00 a.m to approximately 1:30 p.m on June 25, 2002. Cummings noted that he parked on the corner of 62nd Street and Townsend to observe Plaintiff's activities. During this time, Cummings purportedly observed Plaintiff performing household tasks, such as watering flowers, and wheeling her garbage can to the curb, all in casual clothing. Cummings reports that he last saw Plaintiff outside her house at 1:00 p.m. and never saw her leave her property. *See* Pl.'s App. at 219. Plaintiff, on the other hand, has presented evidence directly contradicting Cummings' alleged observations. First, she has testified by affidavit that her home is on 63rd Street and is not visible from 62nd Street. *Id.* at 318. Next, Plaintiff has presented an Affidavit from E. Jay Coon, stating that he and Plaintiff had lunch at House of Hunan at approximately 11:30 a.m. on the day in question.

Defendants, through Barb Maloney, created a memo documenting the reasons for Plaintiff's termination on July 2, 2002 as: "falsification of sales calls and mileage on 6/25/02." Pl.'s App. at 251. Specifically, the memo provides:

Employee falsifies activities

Cathy McAninich [sic] enters 12 face to face sales calls in SAM and 61 business miles in Vendors for the date of 6/25/02.

DSM investigates/interviews employee

Bob Cummings commences investigation by reviewing calls and measuring mileage in Mapquest. Employee is interviewed on 7/2 and offered opportunity to explain activities. Employee maintains all calls were made as entered insisting she started her day at 0900. DSM requests that employee provide a written recap of the day in question. Employee refuses and is terminated for falsification.

DSM continues investigation

Five customers are called to verify employee presence. Of the three that responded, none can validate the sales activity claimed. DSM examines employee laptop upon return of equipment. Many files are purged but Netscape cookies and Temp file folders are intact. DSM prints out and backs up data evidencing laptop was in use while sales calls in question were being made. Laptop also shows activity on pornographic and non-FedEx related sites when sales calls in question were being made. Six additional customers are called to verify employee presence after MD Explore conference call. Of the five that responded, none can validate the sales activities claimed.

Pl.'s App. at 252.

The memo emphasizes that "we have not taken action based on the time of the call entry. SAM is restrictive to 30 minute increments in the start time field, hence it can force a sales person to input a time other than the actual start." *Id.* at 252. Despite FedEx Services' statement that the times put into the computer system were not the basis for Plaintiff's termination, much of the documentation of alleged "inconsistencies" in Plaintiff's reporting revolves around the time entries in the system. A document, apparently pre-pared by Cummings, entitled "Disputed Issues Different accountings of activities from Cathy McAninch," notes that Plaintiff stated she saw an individual named Charlie at Vodaci Technologies at 9:00 a.m. In dispute, Cummings notes that "there was no sign of [Plaintiff] leaving her house until 9:25 AM . . . when [she] was observed watering her plants." *Id.* at 207. The document also states that Plaintiff "was observed several times throughout the day at her home, during times she stated she was at customer locations." *Id.* Moreover, as part of the "investigation" leading up to Plaintiff's termination, Cummings purportedly contacted several of Plaintiff's customers, as noted in the memo above, to determine whether she did, in fact, meet with those customers as Plaintiff stated in her sales report. A careful review of the record, however, does not support Defendants' contention that any attempted verification of Plaintiff's activities occurred *before* her termination. Indeed, Plaintiff was terminated on July 2, 2002, however Cummings' handwritten notes reveal that he attempted to contact Vodaci Technologies in the afternoon on that same date. *Id.* at 230. Likewise, other handwritten notes show that Cummings attempted to contact Performance Display, Clarklift of Des Moines, DSI Distribution, Jacobson Transportation, American Republic Insurance, and Iowa Fastener on the same date that Plaintiff was terminated, in the late morning or early afternoon hours. Pl.'s App. at 220–28, 230. According to those same handwritten notes, Cummings left a message with the receptionist at Performance Display, but did not receive a return phone call. *Id.* at 220. Bill at Clarklift stated that Plaintiff had been "in the week before and took care of a billing problem and brought in pizzas." *Id.* at 221. Regarding DSI Distributors, it is merely noted that "Shane not available." *Id.* at 222. Greg Cannon at Jacobson Transportation re-

ported that Plaintiff had "been in and out of the building on several occasions, regarding information on our machine to process labels." *Id.* at 223. The notes go on to state, however, that "Greg stated he could not recall the exact day or date he last saw [Plaintiff] there." *Id.* Cummings "left [a] message" for Wayne at Iowa Fasteners. *Id.* at 228. Other references to contacting Plaintiff's supposed customer calls of June 25, 2002 are dated well after her termination.[7] Despite FedEx Services' claims that virtually none of Plaintiff's customers confirmed her sales activities entries, Plaintiff herself has offered affidavits and e-mails from numerous of her customers confirming the opposite, *i.e.*, that Plaintiff did in fact meet with those customers on June 25, 2002, and, in many instances, that no one from FedEx ever attempted to contact them about it. *See* Pl.'s App. at 211 (DSI e-mail indicating that Plaintiff was there in "late June"), 212 (Broker Dealer e-mail noting that no one from FedEx contacted them); 213 (American Republic e-mail from John McCuen noting that Plaintiff came in between 11:30 and 12:30 on June 25, 2002 and discussed business issues); 214 (Performance Display e-mail from Joe Feldhacker noting that Plaintiff came in the "early afternoon on 6/25 in regards to some invoicing prob-

lems ... was here for 45 min. to an hour meeting with me"), 215 (Jacobson Transportation e-mail from Greg Cannon confirming that Plaintiff was in on the afternoon of June 25)[8]; 216 (Iowa Fasteners e-mail noting that no one from FedEx ha@d contacted them); 218 (Clarklift e-mail from Bill Dredske stating that Plaintiff was at their location on June 25, 2005).[9]

■ These factual discrepancies regarding FedEx Services' basis for terminating Plaintiff's employment clearly are sufficient to raise a genuine issue of material fact regarding whether similarly situated males were treated more favorably than was Plaintiff. Indeed, in light of these, as well as other clear contradictions in the record, the Court finds that Plaintiff has satisfied the first stage of the *McDonnell Douglas* analysis. That is, Plaintiff has shown: 1) that she is a member of a protected class; 2) that she met applicable job qualifications; and 3) that despite these qualifications, she suffered an adverse employment action. As to the fourth element of the prima facie case, that similarly situated employees outside the protected class were treated more favorably, the evidence viewed in the light most favorable to Plaintiff reveals a genuine issue

7. A handwritten reference to contacting United Information Systems is dated July 12 at 10:05 a.m. Pl.'s App. at 225. A handwritten reference to contacting BDFSC Holdings Corporation is dated August 30, 2002. *Id.* at 226. Two other references to contacting United Information and Clarklift are dated October 30, 2002.

8. This document is unauthenticated, as discussed in the context of Defendants' Motion to Strike, however, it is listed merely for completeness. The other listed documents provide ample support for the proposition posited.

9. These same types of discrepancies appear when comparing Barbara Maloney's report of

FedEx Services' "careful and meticulous review of employee statements, customer research and technical data available" with the evidence in the record. Pl.'s App. at 251. The memo states that of twelve customers Plaintiff claimed in her report to have met with on June 25, 2002, FedEx Services "called eleven. Of these eleven, nine responded. Of these 9, not one customer confirmed that Cathy made a sales call on 6/25/02." Pl.'s App. at 251. The memo goes on to delineate what various customers stated during FedEx Services' investigation, however, several of those purported statements are in direct conflict with sworn statements of those same customers.

of material fact. If, as Plaintiff proffers, Cummings fabricated the basis for her termination, then the similarly situated class would be males who were not subject to internal investigations under false pretenses. Virtually every male coworker in Plaintiff's work group would amply meet this standard. Should a jury decide, on the other hand, that the asserted basis for Plaintiff's termination is truthful, the similarly situated class would necessarily be different. Nonetheless, this factual issue is sufficiently disputed to submit it to a jury.[10] Thus, for purposes of summary judgment, the Court finds that Plaintiff has stated an adequate prima facie case to proceed to the remaining stages of the *McDonnell Douglas* analysis.

### b. Legitimate non-discriminatory reason as pretext

Because Plaintiff has established a genuine issue of material fact on the prima facie portion of the *McDonnell Douglas* analysis, the Court now evaluates whether Defendants have proffered a legitimate non-discriminatory reason for Plaintiff's termination, the adverse employment action in this case. Defendants assert that Plaintiff falsified her reports of the events of June 25, 2002. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. Mo. Dept. of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir.1999). FedEx Services' stated justification is sufficient to meet its burden. Thus, the burden shifts back to Plaintiff to produce evidence sufficient to create a genuine issue of material fact whether Defendants' proffered nondiscriminatory reason was a pretext for discrimi-

nation. *Pope*, 406 F.3d at 1007. As the Supreme Court explained in *Burdine*, "[plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.

The Eighth Circuit Court of Appeals has emphasized that "federal courts 'do not have the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent those judgments involve intentional discrimination.'" *McPheeters v. Black & Veatch Corp.*, 427 F.3d 1095, 1104 (8th Cir.2005) (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)); *see also Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 837 (8th Cir. 2002) ("Courts do not sit as super-personnel departments to second-guess the business decisions of employers.") (citing *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir.1998)). "The threshold question when considering pretext is whether [the employer's] reasons for its employment actions are true, not if they are wise, fair or correct." *Id.; see also Clay v. Hyatt Regency Hotel*, 724 F.2d 721, 725 (8th Cir.1984) ("While an employer's judgment may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was pretext for illegal discrimination."). In this case, Defendants proclaim that Plaintiff's employment was terminated because she falsified her sales activities and mileage for June 25, 2002. Indeed, Defendants wrote numerous memos (notably each after the termination itself) justifying that the basis for

---

10. The Court does not discount the likelihood of other factual disputes based on the present record. At this stage of the proceedings,

however, merely one factual dispute is sufficient to require a jury trial.

Plaintiff's termination had been thoroughly investigated and warranted the adverse employment action taken. As noted in the Court's discussion, *supra,* however, there exists a genuine issue of material fact as to the truthfulness of the purported basis for Plaintiff's termination.

Nonetheless, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. 2742. "[P]roof that the defendant's articulated explanation is false or incorrect does not, standing alone, entitle the plaintiff to judgment; instead, the showing must be that the explanation is a pretext for discrimination." *Hutson,* 63 F.3d at 777. As noted, Plaintiff has clearly raised a genuine issue of material fact regarding whether FedEx Services' stated reason for her termination was false. As discussed in the hostile work environment context, the Court finds that Plaintiff has also raised a genuine issue of material fact regarding whether males and females under Cummings' authority were disparately treated. This is more than ample, at this stage of the proceedings, to find that Plaintiff has presented evidence tending to show that the legitimate non-discriminatory reason for her termination was mere pretext for unlawful discrimination.

## IV. CONCLUSION

For the reasons articulated herein, Plaintiff's Motion to Amend/Correct Complaint (Clerk's No. 44) is GRANTED. Defendants' Motion to Strike Certain Exhibits and Portions of Plaintiff's Statement of Disputed Facts and Brief in Opposition to Defendants' Motion for Summary Judgment (Clerk's No. 37) is DENIED. Defendants' Motion for Summary Judgment (Clerk's No. 17) is GRANTED as to the hostile work environment claim, but DE-NIED as to the gender discrimination claims under federal and state law.

IT IS SO ORDERED